FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

**JUN 2 7 2006**

Stephan Harris, Clerk
Cheyenne

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

CHRISTOPHER KEGLER,

    Plaintiff,

    vs.

UNITED STATES DEPARTMENT OF
JUSTICE, and BUREAU OF
ALCOHOL, TOBACCO, FIREARMS
AND EXPLOSIVES,

    Defendants.

Case No. 06-CV-9-J

## OPINION AND ORDER REGARDING DEFENDANTS' MOTION TO DISMISS

The above-captioned matter comes before the Court on the Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6). The Plaintiff, Christopher Kegler, has resisted all aspects of this motion, timely filing a response brief on April 24, 2006. That brief was replied to by the Defendants on May 12, 2006. After careful consideration of the motion, briefs and governing authorities, and being otherwise fully advised in the premises, the Court **FINDS** and **ORDERS** as follows:

## Background

In this declaratory judgment action, the Court is asked to probe longstanding constitutional and prudential limitations on its own power, as well as modern statutory limitations on the right of a Wyoming citizen, Christopher Kegler, to possess and carry firearms. A finding of justiciability will set in motion a detailed inquiry into nothing less than the proper balance of legislative power in our federal system. Should the Court lack constitutional authority to adjudicate this issue, however, Mr. Kegler's declaratory remedy will vanish, rendering the federalism question academic.

In 1996, Congress approved, and President Clinton signed into law, a number of amendments to the Gun Control Act of 1968 (GCA). *See* 18 U.S.C. §§ 921-930. Among them was an amendment sponsored by New Jersey Senator Frank Lautenberg, which as codified provides that "[i]t shall be unlawful for any person . . . who has been convicted in any court of a misdemeanor crime of domestic violence, to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." *Id.* § 922(g)(9).

On September 27, 2001, the Plaintiff, Christopher Kegler, was convicted of simple assault and battery in a Wyoming state court. Mr. Kegler's conviction constituted a domestic violence misdemeanor under the Family Violence Protection Act, Wyo. Stat. Ann. § 6-2-501,

2

resulting in six months of supervised probation and a federal firearms disability under 18 U.S.C. § 922(g)(9).   Upon completing his term of probation, Mr. Kegler petitioned the Circuit Court of the Seventh Judicial District of Wyoming to have his record "expunged" pursuant to newly-enacted Wyoming Statute § 7-13-1501. This petition was granted over the State of Wyoming's objection on June 29, 2005.

While Mr. Kegler's limited expungement petition was pending, several discussions were held between the United States Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and the Wyoming Attorney General's Office regarding the federal effect of "expungements" under Wyo. Stat. § 7-13-1501.   Portions of this discussion were memorialized in an August 6, 2004 letter from ATF Special Agent Lester D. Martz to Wyoming Attorney General Patrick J. Crank, setting forth ATF's opinion that expungements under Wyo. Stat. § 7-13-1501 would have "[no] effect whatsoever on Federal law." *ATF Letter of August 6, 2004*, at 1.   This letter encouraged the Attorney General to communicate "to any interested parties" ATF's opinion that beneficiaries of such expungements would continue to be prohibited by 18 U.S.C. § 922(g)(9) from shipping, transporting, receiving or possessing firearms and ammunition in or affecting interstate commerce. *Id.* at 3.   But when all was said and done, more was said than done.  The record is devoid of evidence that the Wyoming Attorney General's Office or the United States Attorney's Office contacted Mr. Kegler or otherwise complied with ATF's requests.

3

On January 9, 2006, Mr. Kegler filed suit against the Defendants seeking a declaratory judgment regarding the impact of the Lautenberg Amendment and related GCA provisions to the firearms restoration rights provided by Wyo. Stat. § 7-13-1501. According to Mr. Kegler, this Complaint involves the above-mentioned "legal interpretation[,] which could affect the rights of Plaintiff as well as other Wyoming residents who have had their records expunged pursuant to Wyo. Stat. Ann. § 7-13-1501." *Amended Complaint*, at 2, ¶ 5. Mr. Kegler deems this declaration of rights imperative, as he "seeks to obtain and possess a firearm but would risk imminent prosecution under 18 U.S.C. § 922(g)(9), pursuant to the terms of the [ATF] letter." *Id.* at 3, ¶ 12. Accordingly, Mr. Kegler asks this Court to "enter judgment declaring that Wyo. Sta[t]. Ann. § 7-13-1501 validly removed [his] firearm disability for purposes of 18 U.S.C. § 921(a)(33)([B])(ii)." *Id.*, at Prayer ¶ 1.

The Defendants vigorously oppose this request on two grounds. First, characterizing Mr. Kegler's challenge as hypothetical, the Defendants contend that Mr. Kegler lacks standing to prosecute this claim and as a result, this Court lacks jurisdiction to hear it.[1] Second, the Defendants argue that because Wyo. Stat. § 7-13-1501 does not expunge Mr. Kegler's conviction for purposes of the GCA, Mr. Kegler has failed to state a claim upon which relief can be granted. Mr. Kegler has not been arrested, charged or prosecuted for

---

[1] The Defendants also argue, in a footnote, that Mr. Kegler's claim is not ripe for review.

violating 18 U.S.C. § 922(g)(9), thus his claim constitutes a pre-enforcement challenge.

### Standards of Review

**I.     Fed. R. Civ. P. 12(b)(1)**

This Court, as a court of limited jurisdiction, is ever cognizant of its duty to avoid

deciding what it has no authority to decide.   Affirmatively speaking, constitutional and

statutory authority are required in order to adjudicate a case, should one even exist. *Estate*

*of Harshman v. Jackson Hole Mountain Resort Corp.*, 379 F.3d 1161, 1164 (10th Cir. 2004).

Judgments rendered by a court lacking such authority are void. *Cf. Whitmore v. Arkansas*,

495 U.S. 149, 155-56 (1990) ("A federal court is powerless to create its own jurisdiction by

embellishing otherwise deficient allegations of [justiciability]."). "Article III of the

Constitution limits the power of federal courts to deciding 'cases' and 'controversies,'"

*Diamond v. Charles*, 476 U.S. 54, 61 (1986), and "it is well established that the parties 'may

not by stipulation invoke the judicial power of the United States in litigation which does not

present an actual "case or controversy."'" *Harshman*, 379 F.3d at 1164 (quoting *Sosna v.*

*Iowa*, 419 U.S. 393, 398 (1975)).

Because questions of standing and ripeness concern this Court's subject matter

jurisdiction under the case or controversy clause of Article III, such issues are properly raised

in a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1). *New Mexicans for Bill*

5

*Richardson v. Gonzales*, 64 F.3d 1495, 1498-99 (10th Cir. 1995).[2]   Subject matter jurisdiction involves a court's *power*, not merely its *right* to hear a case, and thus can be neither forfeited nor waived. *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 89 (1998). "It is the burden of the complainant to allege facts demonstrating the appropriateness of invoking judicial resolution of the dispute." *New Mexicans for Bill Richardson*, 64 F.3d at 1499. Lack of such proof will result in dismissal without prejudice. *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006). Justiciabililty "cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotations omitted). The Court will treat as true all nonconclusory allegations of the complaint and, in construing statements made in affidavits, will afford the complaining party the benefit of any factual doubts. *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *D&F Afonso Realty Trust v. Garvey*, 216 F.3d 1191, 1194 (D.C. Cir. 2000).

---

[2]   Approximately one month after receiving the Defendants' Motion to Dismiss—which included an Article III standing argument—Mr. Kegler filed an Amended Complaint. The Amended Complaint altered some, but not all, of the language concerning the immediacy of the "threat of arrest, prosecution and possible incarceration" purportedly inherent in the ATF's letter. *Amended Complaint*, at 3, ¶ 14. As a matter of course, a party may amend the pleadings at any time before a responsive pleading is served. Fed. R. Civ. P. 15(a). Because a motion to dismiss is not a responsive pleading, see *id.* R. 7(a), Mr. Kegler validly exercised his one-time-only amendment as a matter of course. The Court will nevertheless apply the Defendants' Motion to Dismiss to Mr. Kegler's Amended Complaint to the extent that the deficiencies in the original Complaint remain. *See* 6 Wright, Miller & Kane, *Federal Practice and Procedure*, § 1476 (2d ed. 1990 & Supp. 2005).

## II.    Fed. R. Civ. P. 12(b)(6)

A federal district court may dismiss a cause of action for failure to state a claim

pursuant to Fed. R. Civ. P. 12(b)(6) only when it appears beyond a doubt that the plaintiff can

prove no set of facts that would entitle him to relief. *Garcia v. Lemaster*, 439 F.3d 1215,

1217 (10th Cir. 2006). The district court must treat the nonmoving party's allegations as true

and must liberally construe those allegations in a light most favorable to that party. *Moore

v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006). Conclusory allegations need not and will

not be similarly treated, nor will arguments that extend beyond allegations contained in the

complaint. *Bauchman v. West High Sch.*, 132 F.3d 542, 550 (10th Cir. 1997). The district

court may not weigh the evidence, ponder factual nuances, or determine which party will

ultimately prevail; rather, the issue is whether the facts alleged in the plaintiff's well-pleaded

complaint, accepted as true, are sufficient to state a claim upon which relief can be granted.

*Sutton v. Utah State Sch. for the Deaf and Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).

## Discussion

## I.    Justiciability

### A.    Standing and Ripeness: An Overview

At an irreducible constitutional minimum, a plaintiff must satisfy three criteria in

order to establish a "case or controversy" capable of resolution by this Court. *Lujan v.

Defenders of Wildlife*, 504 U.S. 555, 560 (1992). This so-called "standing" requirement of

7

Article III requires that a litigant suffer an "injury in fact" that is fairly traceable to the action

of the defendant and likely to be redressed by a favorable judgment. *Id.* at 560-61. The

Tenth Circuit recently outlined this triumvirate of requirements as follows:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a
> legally protected interest[3] that is both (a) concrete and particularized and (b)
> actual or imminent, not conjectural or hypothetical. Second, there must be a
> causal connection between that injury and the challenged action of the
> defendant—the injury must be "fairly traceable" to the defendant, and not the
> result of the independent action of some third party. Finally, it must be likely,
> not merely speculative, that a favorable judgment will redress the plaintiff's
> injury.

*Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005).

In order for a claim to be justiciable under Article III, it must also be a ripe

controversy. Ripeness represents the time dimension of standing. *Regional Rail

Reorganization Act Cases*, 419 U.S. 102, 140 (1975). That is, while the question of standing

is concerned with *who* may institute the asserted claim for relief, ripeness addresses *when*

---

[3] The term "legally protected interest" appears to entice critique on the merits of a given
legal claim. However, such an impulse must be avoided at this juncture. *Accord Warth v. Seldin*,
422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention
that particular conduct is illegal."). In this regard, the Court finds noteworthy the fact that the author
of the case most often cited for the term "legally protected interest," see *Lujan v. Defenders of
Wildlife*, 504 U.S. 555, 560 (1992), has since jettisoned the term in favor of the more appropriate
phrase "judicially cognizable interest." *See Bennett v. Spear*, 520 U.S. 154, 167 (1997) (Scalia, J.).

that claim may be properly reviewed by a court.[4]   Ripeness finds its roots not only in constitutional "case or controversy" limitations, see *Public Serv. Comm 'n of Utah v. Wycoff Co.*, 344 U.S. 237, 242-44 (1952), but also in prudential considerations that counsel against judicial abstraction and in favor of self-restraint. *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 113-14 (1976); *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99, 105 (1977).[5]

All questions of justiciability—save for mootness—are determined as of the time the action is brought. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180 (2000); *Gwaltney of Smithfield Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 69 (1987) (Scalia, J., concurring). Accordingly, the first question presented is whether, as of January

---

[4] While standing focuses on the nature of the alleged injury and ripeness on when a claim arising from that injury may be reviewed, the doctrinal distinctions are often more cloudy than crystalline. *See, e.g.*, *Morgan v. McCotter*, 365 F.3d 882, 887 (10th Cir. 2004) ("The issues of standing and ripeness are particularly difficult to divorce."); *McInnis-Misenor v. Maine Med. Ctr.*, 319 F.3d 63, 69 (1st Cir. 2003) ("In general, standing and ripeness inquiries overlap."). One can easily imagine a case wherein an arguably anticipated, but nevertheless remote injury might be disposed of on either ground; a personal stake in the outcome (standing) is directly limited by the maturity of the harm (ripeness). Because of the potential for overlap, the Court will address each doctrine individually where necessary.

[5] In addition to Article III limitations on standing, the Supreme Court has also crafted a somewhat malleable cluster of prudential standing considerations which, as noted, embody self-imposed limits on the exercise of federal jurisdiction. *See Warth*, 422 U.S. at 500. The only prudential consideration potentially relevant in the present case is the oft-repeated admonition that federal courts "refrain[] from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 475 (1982) (quoting *Warth*, 422 U.S. at 499-500).

11, 2006,[6] Christopher Kegler faced a concrete and actual or imminent injury, caused by the Defendants and redressable by a favorable judgment. The answer to this question will likely resolve the second inquiry of whether a controversy is ripe for review.

## B.    Does Mr. Kegler Have Standing?

### 1.    *Declaratory Judgment Case or Controversy*

In passing fashion, Mr. Kegler first argues that the standing requirement is, in this case, no requirement at all. Specifically, Mr. Kegler appears to argue that the Declaratory Judgment Act, 28 U.S.C. § 2201(a), substantially alters this Court's standing analysis, eliminating his need to establish an actual or imminent "injury in fact" to prosecute the present action.

The Court disagrees. The mere fact that Mr. Kegler seeks a declaratory judgment under 28 U.S.C. § 2201(a) is, jurisdictionally speaking, of little moment in this case. Invoking that statute does not obviate the injury-in-fact requirement. Quite the contrary, "[i]t is well established that the Declaratory Judgment Act is remedial and does not itself confer jurisdiction on federal courts, *Wyoming v. United States*, 279 F.3d 1214, 1225 (10th Cir. 2002), and that plaintiffs must establish an Article III case or controversy as a prerequisite for declaratory relief, see *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 239-41

---

[6] While a complaint that has been amended pursuant to Fed. R. Civ. P. 15(a) supersedes the pleading it modifies, rendering the original pleading void, an amendment to the pleading "relates back" to the original filing date if the claim asserted in the amended pleading arose out of the same transaction or occurrence set forth in the original pleading. Fed. R. Civ. P. 15(c)(2).

(1937)." *Rector v. City and County of Denver*, 348 F.3d 935, 946 (10th Cir. 2003); *see also Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 527 (6th Cir. 1998) (same); *United Public Workers v. Mitchell*, 330 U.S. 75, 89 (1947) ("[F]ederal courts . . . do not render advisory opinions. For adjudication of constitutional issues, concrete legal issues, presented in actual cases, not abstractions are requisite. This is as true of declaratory judgments as any other field.") (quotations omitted), *overruled on other grounds by Adler v. Board of Educ.*, 342 U.S. 485, 72 S. Ct. 380, 96 L. Ed. 517 (1952).

## 2. *First Amendment Comparisons*

Assuming *arguendo* that 18 U.S.C. § 2201(a) provides no end-run around Article III, Mr. Kegler next asserts that a traditional "injury in fact is not necessary to a judicial determination if the exercise of a protected right is 'chilled' by threat of prosecution." *Plaintiff's Response Brief*, at 4. According to Mr. Kegler, his ability to have Wyo. Stat. § 7-13-1501 officially acknowledged as a valid expungement of federal firearm disability represents such a "protected right," derivative of his right to "possess [and] carry firearms." *Amended Complaint*, at 2, ¶ 10. To bolster this argument, Mr. Kegler relies heavily on decisions from neighboring jurisdictions involving pre-enforcement reviews on First Amendment grounds.

Because present harms can flow from the threat of future actions, declaratory relief can sometimes be granted to protect against a feared future event. The Court agrees with

11

Mr. Kegler that "[i]n a first amendment setting, courts take a more lenient approach [to the injury-in-fact requirement] where criminal sanctions . . . allegedly infringing freedom of speech are at issue." *Plaintiff's Response Brief*, at 5.[7]    Due to the sensitive nature of constitutionally protected speech, numerous courts—including the Tenth Circuit—have "recognized that an ongoing chilling effect can, in some circumstances, amount to a sufficient injury to support standing." *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004); *see also, e.g.*, *National Adver. Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005) ("[O]ur [justiciability] review . . . is at its most permissive in cases concerning putative violations of the First Amendment."); *Navegar, Inc. v. United States*, 103 F.3d 994, 999 (D.C. Cir. 1997) ("Federal courts most frequently find preenforcement challenges justiciable when the challenged statutes allegedly 'chill' conduct protected by the First Amendment."); *Dambrot v. Central Michigan Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995) (similar); *ACORN v. Tulsa*, 835 F.2d 735, 739 (10th Cir.1987) (similar); *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003) ("A plaintiff who mounts a pre-enforcement challenge to a statute that he claims

_____

[7] Counsel for Mr. Kegler paraphrased, without citing, *American Energy Solutions, Inc. v. Alabama Power*, 16 F. Supp. 2d 1346 (M.D. Ala. 1998), for the above-quoted proposition that "[c]ourts take a more lenient approach [to standing] where criminal sanctions or laws allegedly infringing on First Amendment rights are at issue." *Id.* at 1352. Agreeing that this principle applies with equal force in the Tenth Circuit, the Court writes simply to finish the idea Mr. Kegler's counsel borrowed from the court in *Alabama Power*: "In the First Amendment context, the mere allegation that plaintiffs are chilled in their speech for fear of being sanctioned is sufficient to establish an 'injury' for purposes of standing. *Yet, even in the First Amendment context, plaintiffs must allege sufficient facts to support an allegation of 'injury-in-fact.'*" *Id.* (emphasis added) (citing *Hallandale Prof. Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 760-61 (11th Cir. 1991). The Court also underscores the fact that the present case does not involve the First Amendment.

12

violates his freedom of speech need not show that the authorities have threatened to prosecute him; the threat is latent in the existence of the statute."); *cf. Minnesota Citizens Concerned for Life v. Federal Election Comm'n*, 113 F.3d 129, 132 (8th Cir. 1997) (explaining that pre-enforcement review actions are typically ripe when a statute or regulation "imposes costly, self-executing compliance burdens or . . . chills protected First Amendment activity"); *but see Seegars v. Gonzales*, 396 F.3d 1248, 1254 (D.C. Cir. 2005) ("[T]he idea of a special First Amendment rule for preenforcement review of statutes seems to have no explicit grounding in Supreme Court decisions.").

Even in the First Amendment setting, however, broadly asserting a nebulous "chill" does not always cut the constitutional mustard. *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) *Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006); *see generally Younger v. Harris*, 401 U.S. 37, 51 (1971) ("[T]he existence of a 'chilling effect,' even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting [government] action."); *J.N.S., Inc. v. Indiana*, 712 F.2d 303, 306 (7th Cir. 1983) ("Not every chilling effect on protected expression caused by a general possibility of enforcement creates a justiciable controversy."). The Tenth Circuit has explained that a "plaintiff [challenging] a statute on First Amendment grounds . . . must nonetheless establish an injury-in-fact sufficient to satisfy Article III's case-or-controversy requirement." *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003). An injury is constitutionally cognizable in

13

this context when "the plaintiff's expressive activities [are] inhibited by 'an *objectively justified fear of real consequences*, which can be satisfied by showing a *credible threat of prosecution* or other consequences following from the statute's enforcement.'" *Winsness*, 433 F.3d at 732 (emphasis added) (quoting *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004)); *see also Initiative and Referendum Inst. v. Walker*, ___ F.3d ___, 2006 WL 1377028, *4 (10th Cir. May 17, 2006).[8]

First Amendment pre-enforcement review comparisons are thus as inconclusive as they are inapposite. To this end, Mr. Kegler's argument also takes his eye off the ball, for the matter *sub judice* has absolutely nothing to do with protected expression. The traditional injury-in-fact question is unavoidable, and it is the nuances of that inquiry with which the Court must now grapple.

_____

[8] In order to avoid "the danger that Article III requirements be reduced to the formality of mouthing the right words," the Tenth Circuit recently outlined three "chilling effect" criteria the satisfaction of which obviates a plaintiff's need "to show that [he] ha[s] specific plans or intentions to engage in the type of speech affected by the challenged government action":

> Plaintiffs in a suit for prospective relief based on a "chilling effect" on speech can satisfy the requirement that their claim of injury be "concrete and particularized" by (1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so because of a credible threat that the statute will be enforced.

*Walker*, ___ F.3d ___, 2006 WL 1377028 at *5.

14

### 3. *Injury in Fact*

#### a. **Tenth Circuit Overview**

"[A] main focus of the standing inquiry is whether [the] plaintiff has suffered a present or imminent injury, as opposed to a mere possibility, or even probability, of future injury." *Morgan v. McCotter*, 365 F.3d 882, 888 (10th Cir. 2004). While nothing prevents a citizen from preferring official adjudication to public disobedience, pre-enforcement declaratory actions require, at a minimum, "'an objectively justified fear of real consequences, which can be satisfied by showing a credible threat of prosecution.'" *In re Special Grand Jury 89–2*, ___ F.3d ___, 2006 WL 1644716, *12 (10th Cir. June 15, 2006) (quoting *Winsness*, 433 F.3d at 732). The Supreme Court defines a "credible threat" as one that is "real and immediate, not conjectural or hypothetical." *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) (internal quotations omitted). Unfortunately, however, "the adjective 'credible' says little or nothing about the requisite level of probability of enforcement, and clarity prevails only at the poles." *Seegars v. Gonzales*, 396 F.3d 1248, 1252 (D.C. Cir. 2005). Define "credible threat" narrowly, and pre-enforcement review becomes empty rhetoric. Define it broadly, and federal courts become college debating forums.

Recent Tenth Circuit decisions have cast light, albeit faint, on this definitional quandary. In a case involving a putative First Amendment right to express intimate emotions via sodomous acts, the Tenth Circuit explained that "[w]hen a plaintiff challenges

15

the validity of a criminal statute under which he has not been prosecuted, he must show a '*real and immediate threat*' of his future prosecution under that statute to satisfy the injury in fact requirement." *D.L.S.*, 374 F.3d at 974 (emphasis added) (quoting *Faustin v. City and County of Denver*, 268 F.3d 942, 948 (10th Cir. 2001). Assurances from prosecutors that charges would not be brought for the conduct in question were sufficient, when coupled with other factors, to defeat standing in that case. *Id.* at 975; *see also Faustin*, 268 F.3d at 948 (finding no "real and immediate threat" of prosecution due, in part, to city prosecutor's determination that plaintiff's conduct did not violate the challenged statute). A strikingly similar result was reached in *Winsness*, wherein the court found that Utah's flag-abuse statute was "exceedingly unlikely" to be enforced after the Supreme Court's landmark First Amendment decision in *Texas v. Johnson*, 491 U.S. 397, 420 (1989), and assurances of non-prosecution from the district attorney. *Winsness*, 433 F.3d at 732-35.

But the prosecutorial disavowals relied upon in *D.L.S.* and *Winsness* should not be treated as a requirement for every future "case or controversy" question in this jurisdiction, lest the courthouse doors swing open for all disgruntled citizens lacking such assurances. *Cf. Ward*, 321 F.3d at 1268 ("[A]n explicit declaration by the prosecutor that a challenged statute is inapplicable to a plaintiff's behavior is not necessary to defeat standing.").[9] Importantly,

---

[9] Such a requirement teeters dangerously close to demanding that a defendant disprove standing in certain circumstances—a burden nonmovants do not shoulder in the context of a 12(b)(1) motion. *New Mexicans for Bill Richardson*, 64 F.3d at 1499 ("It is the burden of the complainant to allege facts demonstrating the appropriateness of invoking judicial resolution of the dispute.").

16

*D.L.S.* and *Winsness* were not decided solely on the presence or absence of such disavowals. Both panels also deemed probative a more common question: whether the respective plaintiffs had ever "been charged . . . prosecuted . . . or directly threatened with prosecution" under the relevant statute. *D.L.S.*, 374 F.3d at 974; *see also Winsness*, 433 F.3d at 733 (noting similarly as to one plaintiff). Other Tenth Circuit decisions have echoed the importance of such factors. *See, e.g., Wilson v. Stocker*, 819 F.2d 943, 946 (10th Cir. 1987) (finding plaintiff had standing to bring suit because he "was arrested for violating the statute he now challenges" and "presented sworn testimony that he wishes to continue the conduct which precipitated his arrest, but has not done so for fear of rearrest"), *cited with approval in Ward*, 321 F.3d at 1269.

### b.   "Credible Threats" in Sister Circuits

Neighboring jurisdictions have confronted the "credible threat" question in cases relevant—in fact or law or both—to the suit brought by Mr. Kegler.[10]   In *Crooker v. Magaw*,

---

[10] The Court admits that the merits of the present matter—i.e., the viability of 18 U.S.C. § 922(g)(9) in light of recently enacted Wyo. Stat. § 7-13-1501—presents a legal wrinkle heretofore unironed by the federal judiciary.   Nevertheless, the Supreme Court has explained that threshold injury-in-fact questions, like those posed today, "can be answered chiefly by comparing the allegations of the particular complaint to those made in prior standing cases." *Allen v. Wright*, 468 U.S. 737, 751-52 (1984). In so doing, this Court must occasionally venture outside the Tenth Circuit to jurisdictions that have addressed pre-enforcement declaratory judgment actions outside the First Amendment context.   The fact that such claims might differ, in some substantive degree, to the matter *sub judice* has no bearing on the justiciability question.

41 F. Supp. 2d 87 (D. Mass. 1999), a convicted felon and lawful owner of an antique shotgun sought review of ATF's determination that certain types of cartridges were unlawful "ammunition" under the GCA. *Id.* at 89. Before taking the ATF to court, the plaintiff wrote its director to ask "whether he could possess the various cartridges without violating the GCA and risking exposure to criminal prosecution." *Id.* After ATF's response opined that all twelve cartridges in question were "ammunition" under the GCA, the plaintiff sought declaratory judgment that the opposite was true. *Id.* The district court dismissed the case for want of standing. *Id.* at 92. While noting that "[a] plaintiff need not expose herself to arrest or prosecution under a statute in order to challenge that statute in a federal court," the court nevertheless concluded "that fear of possible future application of a federal criminal statute does not confer standing in a declaratory judgment action." *Id.* at 91 (internal quotations omitted). Despite the plaintiff's history as a federal firearms prosecutee, the court held that his fear of future prosecution was "simply too speculative to confer standing." *Id.* ("Although plaintiff may be unsure as to whether he may lawfully possess particular obsolete or homemade cartridges, he faces no credible threat of prosecution at this time. Prosecution is not 'certainly impending.'") (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

In reaching this conclusion, the *Crooker* court relied heavily upon the Sixth Circuit's decision in *National Rifle Association v. Magaw*, 132 F.3d 272 (6th Cir. 1997), where several

18

individual plaintiffs "'desire[d] and 'wish[ed]'" to obtain and possess semiautomatic weapons and large capacity ammunition the manufacture, transfer or possession of which was prohibited, for a ten year period, by 18 U.S.C. § 922(v)-(w) of the Crime Control and Law Enforcement Act of 1994 ("Crime Control Act"). *Id.* at 278, 293.[11] After personally receiving ATF's confirmation concerning the statutory prohibitions and exposure to prosecution, the individual plaintiffs considered themselves unconstitutionally "'restrained' and 'inhibited'" from acting, believing that they were "unable . . ., in light of the serious penalties threatened for violation of the statute, to obtain and possess the firearms and ammunition feeding devices prohibited by the statute." *Id.* at 293. While the court sympathized with the plaintiffs' grievance, it found no standing to adjudicate it, explaining as follows:

> Although the standing requirement of an injury-in-fact is fairly lenient and may include a wide variety of economic, aesthetic, environmental, and other harms, the individual plaintiffs herein allege merely that they would like to engage in conduct, which might be prohibited by the statute, without indicating how they are currently harmed by the prohibitions other than their fear of prosecution. Plaintiffs' assertions that they "wish" or "intend" to engage in proscribed conduct is not sufficient to establish an injury-in-fact under Article III. The mere "possibility of criminal sanctions applying does not in and of itself create a case or controversy." *Boating Industry Associations v. Marshall*, 601 F.2d

---

[11] To be precise, the *Magaw* court was faced with three distinct groups of plaintiffs: (1) licensed manufacturers and dealers of firearms alleging substantial economic harm; (2) individual plaintiffs who wished to possess prohibited firearms; and (3) nonprofit gun rights associations who wished to own, possess and transfer prohibited firearms. *Magaw*, 132 F.3d at 278. It is beyond cavil that the individual plaintiffs in *Magaw* bear the strongest—and indeed, the only—resemblance to Mr. Kegler, thus the Court limits its discussion of that case accordingly.

19

1376, 1384 (9th Cir. 1979); *Jensen v. National Marine Fisheries Serv. (NOAA)*, 512 F.2d 1189, 1191 (9th Cir. 1975). The individual plaintiffs have failed to show the high degree of immediacy necessary for standing when fear of prosecution is the only harm alleged.

We agee with the district court's conclusion that the plaintiffs who telephoned BATF agents, submitted a hypothetical question, and received an answer that the questioned activity could subject them to federal prosecution does not confer standing. The threat of prosecution against these plaintiffs is still abstract, hypothetical, and speculative. Without a direct injury that is "presently effective in fact," the individual plaintiffs do not demonstrate the personal stake and interest necessary to give the litigation the concreteness required for Article III standing.

*Id.* at 293-94 (four citations omitted).

The *Magaw* court also explained that longstanding prudential limitations on standing

counseled against adjudication:

Plaintiffs' allegations of fear of prosecution, which thwarts their desire to possess or transfer prohibited products, affects not only the named plaintiffs, but also anyone desiring to possess the products proscribed by the Crime Control Act. The Supreme Court has refrained from adjudicating "generalized grievances," pervasively shared. *Valley Forge Christian College*, 454 U.S. at 474-75. The individual plaintiffs alleged harm amounts to no more than a "'generalized grievance' shared in substantially equal measure by . . . a large class of citizens," and thus does not warrant the exercise of jurisdiction. *Warth v. Seldin*, 422 U.S. at 499.

*Id.* at 294.

Key factors to finding a "credible threat of prosecution" emerge—at least in the Sixth

Circuit—when the holdings in *Magaw* and *Peoples Rights Organization* are juxtaposed. In

*Peoples Rights Organization*, the court entertained a pre-enforcement challenge to the city

20

of Columbus's assault weapons ban by owners of prohibited weapons faced with express assurances of prosecution. *Peoples Rights Org.*, 152 F.3d at 528, 530-31. The court determined that the plaintiffs were "face[d] with a clear Hobson's choice"—either subject themselves to certain prosecution or relinquish the use and possession of their weapons within city confines. *Id.* at 529. Unlike the generalized grievances maintained by the *Magaw* plaintiffs—i.e., the unarticulated plan to someday purchase prohibited munitions—the plaintiffs in *Peoples Rights Organization* established, to the Sixth Circuit's satisfaction, "the significant possibility of future harm which is necessary to establish standing in a declaratory judgment action." *Id.* at 531 (citing *Magaw*, 132 F.3d at 279); *cf. Steffel*, 415 U.S. at 459-60 (injury-in-fact more likely to exist if plaintiff desires to *continue* conduct barred by statute).

The approach taken by the Sixth Circuit appears moderate when compared to that of the Ninth Circuit, which has found the absence of a specific threat of prosecution fatal in the non-First Amendment, pre-enforcement review context. In *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121 (9th Cir. 1996), a group of militia members, gun dealers and gun rights advocates brought a constitutional challenge to a portion of the Crime Control Act that imposed new licensing requirements on firearm dealers. *Id.* at 1124. The court rejected a broad "fear of prosecution" argument, noting that the plaintiffs had not shown a "*genuine* threat of *imminent* prosecution." *Id.* at 1126 (internal quotation omitted). Three perceived flaws mandated this result. First—employing a blend of standing and ripeness

21

considerations—the court explained that the plaintiffs

> have not articulated concrete plans to violate the Crime Control Act. Instead, plaintiffs merely assert that they "wish and intend to engage in activities prohibited by Section 922(v)(1)." The complaint does not specify any particular time or date on which plaintiffs intend to violate the Act. As the Supreme Court has observed, "[s]uch 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan*, 504 U.S. at 564, 112 S. Ct. at 2138. Plaintiffs are thus in a different situation from the plaintiffs granted standing in *Babbitt* because the latter alleged that they had previously engaged in and would continue to engage in acts regulated under the challenged legislation. *Babbitt*, 442 U.S. at 303, 99 S.Ct. at 2311.

> The acts necessary to make plaintiffs' injury—prosecution under the challenged statute—materialize are almost entirely within plaintiffs' own control. Plaintiffs have failed to show the high degree of immediacy that is necessary for standing under these circumstances. *Lujan*, 504 U.S. at 564-65 n. 2, 112 S.Ct. at 2138 n. 2.

*Id.* at 1127.

A second flaw in the plaintiffs' fear-of-prosecution argument was the absence of any threat of "arrest, prosecution or incarceration." *Id.* The court acknowledged that a specific warning of an intent to prosecute "may suffice to show imminent injury and confer standing," but also noted that a "general threat of prosecution [was] not enough." *Id.* The court concluded that "*eventual* prosecution under the Crime Control Act," as alleged by the plaintiffs, fit neatly into the latter category. *Id.* (emphasis added). The lack of a general history of prosecutions under the challenged provisions of the Crime Control Act constituted a third and final reason weighing against a finding of an injury in fact. *See id.* at 1128 ("Plaintiffs' inability to point

22

to any history of prosecutions undercuts their argument that they face a genuine threat of prosecution."). Ill-defined plans to violate federal law, coupled with the absence of a specific threat of prosecution or a demonstrated history thereof resulted in an easy decision for the court in *San Diego County*.

The D.C. Circuit embraced similar factors in two of its most recent non-First Amendment pre-enforcement review decisions. In *Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997), the court confronted the pre-enforcement challenges of two firearm manufacturers to Crime Control Act provisions similar, but not identical, to those at issue in *Magaw*. On the day the Crime Control Act became law, ATF inspection agents visited the two plaintiffs at their respective manufacturing sites, informed the plaintiffs of the new firearm manufacturing prohibitions and explained future ATF inventory plans. *Id.* at 997. After its first visit, ATF sent both plaintiffs a letter once again summarizing the specific actions prohibited by the Crime Control Act. *Id.* The court found a "credible threat of imminent prosecution" as to the portions of the Crime Control Act that essentially singled out the companies by name, but found no standing to challenge portions of the Act that described prohibited weapons only by general characteristics. *See id.* at 999. Regarding the weapon-specific provisions, the D.C. Circuit concluded as follows:

> [T]he Act in effect singles out the appellants as its intended targets, by prohibiting weapons that only the appellants make. This fact sets this case apart from most others in which preenforcement challenges to the Act have been held nonjusticiable.

23

And the fact that the Act specifically names products made only by the appellants is telling indeed, because it shows that the law places a high priority on eliminating this portion of the appellants' business. The visits by the ATF agents to appellants' places of business merely provide a bit of additional support for a fear of prosecution already firmly grounded in the language of the Act itself.  By sending its agents to notify appellants of the prohibitions of the Act on the day it was passed, directing them to conduct an immediate inventory of "grandfathered" weapons, and following up the visits by sending appellants a letter reminding them of the prohibitions of the Act, the government made it quite clear that it had every intention of enforcing these prohibitions.

*Id.* at 1000.

Unlike the provisions that singled out the activities of the *Navegar* plaintiffs, the portions of the Act outlawing "large capacity ammunition feeding devices" presented, in the court's judgment, no genuine threat of imminent prosecution. *See id.* at 1001 ("[Plaintiffs] cannot invoke the one factor that we found most significant in our analysis of the other challenges—the statute's own identification of particular products manufactured only by the appellants.   In the absence of this factor, the threat of prosecution becomes far less imminent, and these parties' claims to standing concomitantly much weaker.").  Invoking the "specified threat" standard espoused by the Ninth Circuit in *San Diego County*, the *Navegar* court paid little heed to the government's "demonstrated . . . interest in enforcing the Act generally," concluding that "nothing in these portions indicates any special priority placed upon preventing these parties from engaging in specified conduct." *Id.*  Accordingly, the court could not find "that a genuine threat of enforcement has given rise to the requisite

'injury in fact' and thus given these parties standing." *Id.*

The D.C. Circuit's recent holding in *Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005), reverberated its second-half determination in *Navegar*. *Seegars* involved a Second Amendment claim by an amalgamation of plaintiffs living within the District of Columbia who, in the words of the court, "would like to lawfully possess pistols in the District." *Id.* at 1250.[12]   However, three interrelated provisions of the D.C. Code made it impossible "to purchase and lawfully possess a new pistol—or indeed any pistol not registered [in the District] three decades ago." *Id.* A fourth provision required registrants to keep all firearms unloaded and disassembled or bound by a trigger lock, subject to public service and recreational exceptions. *Id.*

While disavowing the inflexible requirements that plaintiffs "express an *unconditional* intention to engage in the proscribed behavior" and law enforcement specifically threaten prosecution, the *Seegars* panel nonetheless declined to throw irretrievably overboard the non-First Amendment "credible threat" rationales of *Navegar*, *Magaw* and *San Diego County*.

---

[12]   More specifically, two plaintiffs in *Seegars* owned firearms—Plaintiff Jordan a pistol which he stored outside the District of Columbia, and Plaintiff Hailes a registered shotgun equipped with a trigger lock she desired "to remove . . . when she fe[lt] endangered" in her home. *Seegars*, 396 F.3d at 1250-51. No other plaintiff in *Seegars* owned a weapon; instead, these plaintiffs simply alleged that they "live[d] in high-crime neighborhoods and [wanted] to possess loaded weapons in their homes for protection, not secured by a trigger lock." *Id.* at 1251. However, "because of the threat of criminal prosecution," the plaintiffs felt unconstitutionally compelled to forego what they believed to be "the additional security of possessing pistols or possessing a shotgun ready for immediate use." *Id.*

Traversing a middle ground first navigated by *Navegar*, the court held that none of the

plaintiffs had standing to challenge the weapons ban, explaining as follows:

> For preenforcement challenges to a criminal statute not burdening expressive
> rights and not in the form of appeal from an agency decision, our circuit's
> single post-[*Babbitt*] case appears to demand more than a credible statement
> by the plaintiff of intent to commit violative acts and a conventional
> background expectation that the government will enforce the law.
>
> . . . .
>
> We agree with the district court . . . that the . . . plaintiffs have not shown a
> threat of prosecution reaching the level of imminence required by *Navegar*.
> *See* 103 F.3d at 1001. Plaintiffs note that the District's gun laws are enforced,
> and indeed cite the District's position in prior litigation, declaring that it
> enforces its gun laws, prosecuting "all violators of the statute under normal
> prosecutorial standards." But plaintiffs allege no prior threats against them or
> any characteristics indicating an especially high probability of enforcement
> against them. As was true for the claims found non-justiciable in *Navegar*,
> "nothing . . . indicates any special priority placed upon preventing *these parties*
> from engaging in specified conduct." 103 F.3d at 1001.

*Id.* at 1254, 1255 (three citations omitted).[13]

### c.    Mr. Kegler's Situation

The foregoing cases, while extremely helpful, do not eliminate the fact that guidance

in this sensitive area of constitutional law veers in several directions, leaving ample room for

disagreement. The clarity of a "credible threat" is oftentimes anything but clear, usually

---

[13] This rationale was not limited to the plaintiffs "seeking" to obtain and possess firearms.
*See Seegars*, 396 F.3d at 1255 (holding, for example, that even Plaintiff Jordan—the pistol
*owner*—suffered no cognizable injury, there being "nothing in the record to indicate that he has been
personally threatened with prosecution or that his prosecution has 'any special priority' for the
government") (quoting *Navegar*, 103 F.3d at 1001).

turning on the facts of each case and on a sliding-scale judgment that is hard to calibrate. Some cases are tougher than others. Fortunately, the present matter is not a fence-straddler.

According to Mr. Kegler, the development of the aforementioned events, in conjunction with the opinions stated in ATF's August 6, 2004 letter to the Wyoming Attorney General, might result in his prosecution for violating 18 U.S.C. § 922(g)(9). In effect, Mr. Kegler argues that this letter places him between the Scylla of intentionally flouting federal firearms law and the Charybdis of forgoing what he believes to be statutorily protected activity in order to avoid imminent prosecution. *Cf. Steffel*, 415 U.S. at 462. While sympathizing with the unclear nature of Mr. Kegler's predicament, the Court respectfully disagrees.

Mr. Kegler "seeks to obtain and possess a firearm" at some imprecise point in the indefinite future, but fears, in conclusory fashion, that he "would risk imminent prosecution under 18 U.S.C. § 922(g)(9)" for doing so. *Amended Complaint*, at 3, ¶ 12. Mr. Kegler does not allege past or present firearm ownership. He does not allege an attempt to purchase a firearm, much less a failed transaction. He does not aver that a firearm has been confiscated by the ATF. Finally, he alleges absolutely no contact by the Defendants, much less a threat of investigation, arrest or prosecution. *Cf. Phelps v. Hamilton*, 122 F.3d 1309, 1327 (10th Cir. 1997) ("[T]here [being] no evidence that [District Attorney] Hamilton has made any threat to prosecute the plaintiffs for violation of the telefacsimile amendment[, t]he plaintiffs'

27

allegation that Ms. Hamilton has threatened to prosecute them generally is not enough to confer standing."). Indeed, Mr. Kegler admits that his scenario presents a "legal interpretation which *could* affect the rights of Plaintiff as well as other Wyoming residents who have had their records expunged pursuant to Wyo. Sta[t]. Ann. § 7-13-1501." *Amended Complaint*, at 2, ¶ 5 (emphasis added). This simply will not do.

Mr. Kegler's putative injury is neither real nor imminent, but rather, wholly conjectural and hypothetical. *D.L.S.*, 374 F.3d at 974. His showing of a "credible threat of prosecution" is far less particularized than those made by the plaintiffs in *Crooker, Magaw* and *Navegar*—plaintiffs whose pre-enforcement review actions, it should be noted, were dismissed for want of standing. The claims of the plaintiff in *Crooker* were dismissed despite his posing of a particular question to ATF and receiving a particularized response. *Crooker*, 41 F. Supp. 2d at 89. The individual plaintiffs in *Magaw*—who "'wish[ed] or 'intend[ed]' to engage in proscribed conduct"—suffered a similar fate despite receiving direct confirmation from the ATF that the questioned behavior would subject them to prosecution. *Magaw*, 132 F.3d at 293-94. The ammunition and feeding device challenges in *Navegar* fit the same list, despite ATF's site visit and follow-up letter. *Navegar*, 103 F.3d at 1001.

Mr. Kegler, in effect, attempts to ask this Court the questions posed to ATF by the aforementioned plaintiffs. The Court agrees that an answer might assist countless

28

Wyomingites who are, or in the future might be, convicted of a misdemeanor crime of domestic violence. *See Amended Complaint*, at 2, ¶ 5; *but see Crooker*, 41 F. Supp. 2d at 92 ("A moment's exercise of imagination conjures up almost infinite scenarios where a citizen might want . . . an advisory opinion as to whether conduct 'X' violates statute 'Y.'"); *San Diego County*, 98 F.3d at 1128 ("[E]stablish[ing] at most a possibility of . . . eventual prosecution under the Crime Control Act . . . is clearly insufficient to establish a 'case or controversy.'"). However, "declaratory judgment actions cannot be used to obtain answers to hypothetical questions. As the cases already cited make clear, concreteness of injury is crucial to exercise of judicial power." *Crooker*, 41 F. Supp. 2d at 92. Federal courts are not oracular authorities.

The lack of moderately-defined plans to purchase a prohibited firearm, the absence of a demonstrated history of prosecution of Wyomingites under 18 U.S.C. § 922(g)(9) who are also beneficiaries of Wyo. Stat. § 7-13-1501, and the total absence of a threat of investigation, arrest or prosecution leaves the statutory provision itself (18 U.S.C. § 922(g)(9)) as the only potential basis for, in the Tenth Circuit's words, "an objectively justified fear of real consequences." *Winsness*, 433 F.3d at 732 (quoting *D.L.S.*, 374 F.3d at 975). But this circular argument is also insufficient to satisfy standing requirements in a non-First Amendment pre-enforcement review action. *Cf. Hilton v. Robinson*, 1992 WL 63391, *5 (D. Utah 1992) (unpublished disposition) ("'The mere existence of a statute, which

29

may or may not ever be applied to [a] plaintiff[], is not sufficient to create a case or controversy within the meaning of Article III.'") (quoting *Stoianoff v. Montana*, 695 F.2d 1214, 1223 (9th Cir. 1983)). If the United States Code, perched on a law library shelf, qualified as an injury in fact, courts would not waste time—as they currently do—distinguishing between credible threats of imminent prosecution and potential (yet hypothetical) applications of a given statute. *See, e.g.*, *Crooker*, 41 F. Supp. 2d at 91 ("[F]ear of possible future application of a federal criminal statute does not confer standing in a declaratory judgment action.") (internal quotations omitted); *Winsness*, 433 F.3d at 733; *D.L.S.*, 374 F.3d at 974; *Seegars*, 396 F.3d at 1252. Instead, Article III requirements would be "reduced to the formality of mouthing the right words," converting federal courts into college debating forums and federal judges into honorary moderators.

Mr. Kegler has suffered no "credible threat of prosecution" sufficient to establish an Article III injury in fact under even the most generous approach to that inquiry in this circuit. *See Walker*, ___ F.3d ___, 2006 WL 1377028 at *5; *Winsness*, 433 F.3d at 732; *supra* n.7 (outlining First Amendment "chilling effect" pre-enforcement review standard). Under any standard, Mr. Kegler lacks standing.[14]

---

[14] Because Mr. Kegler cannot establish an injury in fact, the Court eschews a discussion of the casual connection and redressability elements of standing, and withholds a detailed ripeness analysis. Assuming, for the sake of argument, that Mr. Kegler has established standing to prosecute a live controversy ripe for adjudication, the Court nonetheless doubts it has federal question jurisdiction to hear it. Mr. Kegler insists the Court has jurisdiction, "based on 18 U.S.C. §§ 921B(ii), 18 U.S.C. § 922(g)(9), Wyo. Stat. Ann. § 7-13-1501 . . . and 28 U.S.C. § 1331(a)." *Amended*

## II.   Conclusion

A custom judicial fit for every off-the-rack legal dispute is, in a word, impossible. It is also, in many circumstances, constitutionally and statutorily forbidden. Today's case presents no exception. Article III prohibits the Court from deciding the merits of Christopher Kegler's Amended Complaint. Because the Court lacks jurisdiction over Mr. Kegler's declaratory judgment action, it does not address the question of whether that action fails to state a claim upon which relief can be granted.

---

*Complaint*, at 1-2, ¶ 4. However, the GCA provisions referenced by Mr. Kegler are not jurisdictional provisions, and do not otherwise create a federal cause of action. *Woods v. City and County of Denver*, 62 Fed. Appx. 286, 289 (10th Cir. 2003) (unpublished disposition). Moreover, "construction of a federal statute, standing alone, is not a 'cause of action,' nor does it confer federal question jurisdiction." *Id.* (citing *Rice v. Office of Servicemembers' Group Life Ins.*, 260 F.3d 1240, 1245 (10th Cir. 2001)). Thus, much like the district court in *Woods*, this Court is "left with only a request for declaratory judgment. [However], the Declaratory Judgment Act does not extend the jurisdiction of federal courts." *Id.* at 290 (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)).

Finally, Mr. Kegler's Amended Complaint would likely fail the "well-pleaded complaint" rule of *Louisville and Nashville R.R. Co. v. Mottley* and progeny, see 211 U.S. 149, 152 (1908), as no federal question giving rise to jurisdiction appears on the face of Mr. Kegler's well-pleaded complaint, unaided by the answer, additional arguments or potential defenses. *Accord Nicodemus v. Union Pacific Corp.*, 440 F.3d 1227, 1232 (10th Cir. 2006). For whatever reason, Mr. Kegler neither argues nor asks this Court to declare that the aforementioned portions of the GCA are unconstitutional in light of Wyo. Stat. § 7-13-1501 and/or the Second Amendment. Finally, even if this Court were to creatively construe Mr. Kegler's quotation of § 922(g)'s phrase "possess [a] firearm," as a Second Amendment attack on that provision, disposition in this case would remain the same.

31

Accordingly, and for the foregoing reasons, it is hereby

**ORDERED** that Defendants United States Department of Justice and Bureau of Alcohol, Tobacco, Firearms and Explosives' Motion to Dismiss shall be, and now is, **GRANTED** for want of jurisdiction. All claims against the Defendants are dismissed without prejudice.

**IT IS SO ORDERED.**

Dated this ___ day of June, 2006.

ALAN B. JOHNSON
UNITED STATES DISTRICT JUDGE